**In re Brent J. REASON, Debtor.**

**The Cottonport Bank, Plaintiff,**

**v.**

**Brent J. Reason, Defendant.**

**Bankruptcy No. 00–80046.**
**Adversary No. 00–8014.**

United States Bankruptcy Court,
W.D. Louisiana,
Alexandria Division.

Sept. 29, 2000.

2000.

Robert L. Royer, Alexandria, LA, for debtor.

Lucy G. Sikes, Alexandria, LA, for plaintiff.

## REASONS FOR DECISION

HENLEY A. HUNTER, Bankruptcy Judge.

This matter comes before the Court on the Plaintiff's Objection to the Discharge of the Debtor or, alternatively, to determine the debt due the plaintiff to be non-dischargeable. This is a Core Proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I) and (J). This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 83.4.1 incorporated into Local Bankruptcy Rule 9029.3. No party at interest has sought to remove the reference to the bankruptcy court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with F.R.B.P. 7052. Pursuant to these reasons, there will be judgment in favor of the plaintiff sustaining its objection to the debtor's discharge.

## SUMMARY OF THE EVIDENCE

Debtor filed a voluntary petition under Chapter 7 on January 13, 2000. Plaintiff filed this Complaint on April 6, 2000, maintaining that debtor's discharge should be denied under 11 U.S.C. § 727(a)(2)(A) and (a)(5). The parties have stipulated that debtor was in default of three loans to the plaintiff totaling $99,601.92. These notes were secured by collateral consisting of real estate comprising of debtor's residence, equipment located at a store leased by the debtor, and a 1999 Harley–Davidson motorcycle.

In early 1999, Debtor approached an officer of The Cottonport Bank ("Cottonport"), Mr. Blake Tassin, about purchasing a store then operated by Tassin's in-laws, Mr. and Mrs. Glen Marcotte. Reason maintains that Mr. Tassin represented to him that the latter kept the books and records for the store and assured him the enterprise would generate $20,000.00 in gross income and $5,000.00 net income per month. Reason testified that Mr. Tassin furnished him a document showing these figures which was offered and introduced as *Exhibit P–1.* Tassin denies having made such representations to Reason and denies the authorship of the document.

Nevertheless, Tassin arranged a loan with the bank for Reason to purchase the store. The loan was secured by a mortgage on the store's fixtures and inventory. After the closing, Reason testified that Tassin came to the store, now operated by Reason, and told the latter the bank needed additional collateral in the form of a mortgage on Reason's home. Reason insists he would not have purchased the store if he had known he would be required to mortgage his home, but nevertheless, he complied with the bank's wishes. Later, in June, 1999, Reason purchased a Harley–Davidson motorcycle from the Harley–Davidson dealership in Alexandria, Louisiana, and financed that purchase through the Cottonport Bank.

Reason's operation of the store did not generate the profit margin he anticipated, and he began making preparations to close it. However, he neglected to advise the bank of those intentions. Mr. Walter P. Bordelon, Jr., testified that he operated the store prior to the Marcottes, and approached Reason about buying the store after observing Reason loading items from the store into his truck. In fact, Mr. Bordelon helped Reason load several boxes into his truck on that occasion, at which time Reason's mother was also present. Bordelon approached Mr. LaCour at Cottonport Bank concerning the purchase of some of the bank's collateral. Bordelon wrote a check to Reason and the bank for that purchase.

Precisely what that check was intended to cover is disputed. Another document generated at the time of the sale is also the subject of a dispute as to its contents. Reason claims that both were altered after his endorsement of the check and delivery of the related document to the bank's attorney, Mr. Luke. Bordelon's check, in the amount of $1,900.00, according to debtor, was intended to cover only freezers, coca-cola boxes, a cash register, a meat slicer, and one air conditioning unit (another belonged to the owner of the building). Luke acknowledged making changes on the check following Reason's endorsement on same, and also to the related document concerning the sale. *Exhibit P–2.* He testified he did so to clarify the terms of the sale in case there was a "swearing match." Clearly, the check and the related document do not match copies retained by debtor's counsel in this Adversary Proceeding. *Exhibit D–1.* While Luke's changes to the documents only confused the situation, the debtor and Bordelon both agree the inventory was not a subject of their agreement. Bordelon testified he did not want to buy the inventory, since it was out of date and not saleable.

Reason insists that inventory valued at $15,000.00, was "still in the store" when he sold it, this after he returned merchandise where possible to various vendor's for credit. This explanation is completely at odds with Bordelon's testimony that, when the latter reopened the store, it was emp-

ty, and it was necessary for him to restock it, at a cost of $15,000.00. Reason provided no proof that he actually returned any merchandise to any vendor, much less proof that he used any of such proceeds to pay Cottonport.

Reason closed the store on or about December 20th, 1999. He disconnected the electricity just prior to closing and moved the freezers (which he claims contained frozen food) to his house. He claims Mr. Bordelon came to his house and picked up the goods and took the freezers back to the store. However, Mr. Chris Smith, an acquaintance of Reason, testified that he helped Reason move the freezers to his home, and that he saw no frozen food in them. He noted that the freezers were light enough to move from the store without difficulty. Later that same day, Mr. Bordelon retrieved the freezers from the Reason residence. He testified they were empty.

Following the filing of the bankruptcy, debtor, his bankruptcy counsel, and counsel to the bank had discussions at the § 341 meeting and on another occasion where a "workout" was proposed. When negotiations failed, Reason surrendered his home to the bank. He claims to have removed only a ceiling fan, which "belonged" to his spouse. Reason then left the house without, according to him, locking it and left the motorcycle there.

Reason acknowledges that he did remove a metal building from the premises which had been installed on a slab, since, he claimed, it belonged to his father. This removal, he testified, was authorized by his bankruptcy counsel, following the § 341 meeting. However, Mr. Dwayne LaCour, another bank employee, testified that he went to the "workout" meeting with Reason and his bankruptcy counsel. There, according to Mr. LaCour, Reasons' attorney confirmed the existence of the bank's lien on the shed after reviewing the loan documents. Mr. LaCour expressly instructed debtor not to do anything with the shed.

At some point, Reason surrendered the keys to the residence to Mr. Luke who along with other bank employees then inspected the residence after Reason vacated same. When they arrived, they found the house locked and had to return to the bank to retrieve the keys. However, they did not need to enter the residence to observe a large sign left in the garage, visible from the road, reading "F* * * The Cottonport Bank and Dwayne LaCour." *Exhibit P–11* (Expletive deleted). Mr. LaCour testified that he received some 40 phone calls concerning the sign. He also recalled a conversation with Reason shortly after the § 341 meeting when Reason threatened to remove the water line to the house.

Mr. Luke's inspection revealed that a number of light fixtures or ceiling fans had been removed from the house. A light pole had been removed from a concrete base and the storage shed had been removed from its slab. Luke took a series of photographs of the premises. *Exhibit P–4.*[1] The Harley–Davidson motorcycle was in the garage, partially dismantled. The bike was transported to Alexandria Harley–Davidson where Mr. James D. Bowie, shop manager for the dealership, testified that several items were missing. The original repair estimate was $676.71 and the total repairs were performed for $847.81. *Exhibit P–7.* Reason acknowledges he removed some items from the bike, particularly a "sissy bar," since he

---

**1.** The bank's representatives maintain that a microwave had been removed from the kitchen cabinet area, that a mirror had been removed from a bath, that damage had occurred to a cable outlet, and that damage had occurred to the exterior of the residence. The photographs do not support these damage claims. There is no evidence that a microwave or mirror were ever installed as a permanent fixture. Nor do we believe that debtor caused any damage to the stucco or siding on his residence. The bank's out-of-pocket repair costs to replace missing fixtures was only $155.92, according to their representative, Mr. Rabalais. While those damages were *de minimis,* the damages to the motorcycle, the removal of the building, and the loss of the inventory were far more significant.

wished to use the bike for racing. Mr. Bowie's testimony suggests that the modifications to the bike were not consistent with racing.

Later, a garage sale took place at a house owned by debtor's parents, conveniently located next to debtor's new residence, where, coincidentally, the metal building had been reconstructed.[2] While Reason denies participating in the sale, and insists only the ceiling fan removed from the residence was sold, numerous witnesses dispute this version. Ms. Charlene LeMoine testified that she observed grocery items at the sale and bought canned soup, grits and Kool–Aid. She also observed ceiling fans for sale and an outdoor light on a pole. Debtor's mother, Rosemary Reason, testified that the items in the garage sale did not come from the store, but instead, came from either her own pantry or her deceased sister-in-law's home. She also contributed some alcoholic beverages to the sale, since she was afraid they would "go bad." However, at a pretrial deposition, she denied having contributed any grocery items to the sale, and that any whatsoever were sold. *Exhibit P–13.*

## APPLICABLE LAW

11 U.S.C. § 727(a)(2)(A) provides that the debtor shall be granted a discharge unless he has "... with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of proper-

ty under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the estate, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A).

 Denial of the discharge under 11 U.S.C. § 727 requires a showing of a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The question of intent is a question of fact. Under § 727(a)(2)(A), the showing must be actual intent, rather than constructive intent. *Collier on Bankruptcy,* 15th Ed. Revised, ¶ 727.02[3][a], citing, inter alia, *Matter of Reed,* 700 F.2d 986 (5th Cir.1983).

 Under 11 U.S.C. § 727(a)(5), the debtor shall be granted a discharge unless he "has failed to explain satisfactorily, before determination of denial of the discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Under this section, the plaintiff has the initial burden of going forward with sufficient evidence to "prove the objection." F.R.B.P. 4005, *Collier on Bankruptcy,* 15th Ed., ¶ 727.08. Once that burden is surmounted, the burden shifts to the debtor to furnish a satisfactory explanation of what occurred.[3]

**2.** Reason now lives on property which he and his prior spouse acquired in 1996 by a deed reciting a consideration of $100.00 cash and "other good and valuable consideration." *Exhibit P–3.* The property was then the subject of a community property settlement between Reason and Arlene Marie Reason in 1998. *Exhibit P–5.* According to the latter document, the former spouses were to continue to hold the former home located on Bayou DeGlaise jointly until it could be sold. The property where Reason now lives, however, does not appear to be expressly described, and is reportedly unimproved. The former Mrs. Reason conveyed at least her interest in that property to Jeannie C. Smith, who is some relation to Reason's present spouse. *Exhibit P–6.* Reason's father, Alfred Reason,

testified that he helped Reason relocate the metal building and rebuild it. Reason may still own an interest in this property, although he testified that any interest he once owned now belongs to his father, who provided a trailer for Reason to live in after the house was surrendered to the bank.

**3.** Although plaintiff seeks alternative relief in the form of a determination of non-dischargeability, no express reference is made to a codal provision. Presumably § 523(a)(6) could apply to "willful and malicious injury" to a secured creditor's property rights in collateral. In the 5th Circuit, willful and malicious injury claims have been recognized as recoverable to the extent of the value of the collateral at the time of the unlawful disposi-

## ANALYSIS

 This is a case where reason did not prevail. Instead, Reason sought to extract retribution for what he apparently perceived as injuries inflicted by Cottonport by concealing its collateral from them by disposing of inventory at a garage sale, stripping the motorcycle, removing fixtures from the residence, removing a building from the yard (despite express warnings), and finally, to add insult to injury, by leaving tangible proof of his intentions in the form of an obscene "calling card" for the public, the bank, and its officer, Mr. LaCour. The debtor's explanations of these events are simply not credible.

For example, he suggests that the house was left unlocked, and the bank did not timely take possession. Thus, the fixtures, other than one fan, mysteriously disappeared, perhaps the work of the same vandals who left the vulgar sign and who caused the inventory to disappear. While an inordinate amount of the trial testimony related to who wrote what on the check and the related document, a result of an extremely poor judgment call by Mr. Luke, it is a non-issue. There is no doubt that Reason set about disposing of the bank's collateral without their knowledge and consent. The notion that Reason simply walked away from the store, leaving its inventory intact, is implausible at best. His version is flatly contradicted by the testimony of Mr. Bordelon who saw him loading items into his truck, and a witness who purchased grocery items at the garage sale. Given that every single explanation he gave has been contradicted by numerous other witnesses, Reason has failed to satisfactorily explain the loss of his assets or contradict the evidence of his actual intent to hinder, delay, and defraud the bank by transferring, removing, destroying, mutilating, and concealing property of the estate. Cottonport Bank is clearly entitled to judgement denying debtor his discharge under both § 727(a)(2)(A) and (a)(5).

## CONCLUSION

Pursuant to these reasons, there will be judgment herein in favor of the plaintiff denying the Debtor a discharge. A separate and conforming order will enter.

---

tion. *In re Modicue,* 926 F.2d 452 (5th Cir. 1991). Following the holding in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90, debts arising from injuries recklessly or negligently inflicted do not fall within this exception to the discharge. The Fifth Circuit has adopted a test for "willful and malicious injury" where there is either an objective substantial certainty of harm or a subjective motive to cause harm. *Miller v. J.D. Abrams, Inc.,* 156 F.3d 598 (5th Cir. 1998). While other courts have followed *Miller,* the Tenth Circuit suggests that the test turns on the state of mind of the debtor. Thus, when the debtor does not actually desire or anticipate injury, then § 523(a)(6) is not implicated. *In re Englehart,* 229 F.3d 1163 (10th Cir.2000). This Court is satisfied that Reason's conduct here would satisfy either test. Reason intended to deprive Cottonport of its collateral by any means at his disposal. This contrasts vividly with situations involving collateral that simply becomes useless from age or deterioration and is simply discarded without thought of the consequences to a lender. In view of the determination that plaintiff is entitled to a judgment under § 727 on these facts, these reasons do not address the value of the collateral at the time of its unlawful disposition under *Modicue.*